MICHAEL J. KENNEDY
Law Offices of Michael Jerome Kennedy, PLLC
Nevada State Bar #10103
California State Bar #193901
Colorado State Bar #17868
333 Flint Street
Reno, Nevada 89501
775-221-7100 (office); 775-233-0914 (mobile)
michael@mjkennedylaw.com

ANDREA LEE LUEM
Andrea L. Luem, Esq.
400 South Fourth Street, Suite 500
Las Vegas, Nevada
702-600-8403 (office)
Andrea@luemlaw.com
**Attorneys for Defendant David Perez-Manchame**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:19-cr-103-JCM-VCF |
| Plaintiff, | **Joint Stipulation To Amend ECF No. 44, The Complex Case Scheduling Order** |
| v. | |
| JOSE LUIS REYNALDO REYES-CASTILLO, MIGUEL TORRES-ESCOBAR, DAVID ARTURO PEREZ-MANCHAME, | |
| Defendants. | |

Plaintiff United States of America, and Defendants Jose Luis Reynaldo Reyes-Castillo, Miguel Torres Escobar and David Arturo Perez-Manchame, through their respective attorneys, hereby stipulate to amend the complex case scheduling order entered in this case on January 7, 2020 (ECF No. 44) as set forth below. Given the complexity of the evidence, volume of discovery (which is ongoing), and the emergence of the COVID-19 public health pandemic since the amended complex case scheduling order, and the death penalty protocol process (for all three charged defendants), it is unreasonable to expect each defendant could adequately prepare for trial within the time-frame mandated by the Speedy Trial Act and the present complex case scheduling order (ECF No. 44).

## I. COMPLEXITY AND VOLUME OF THE CASE

A. **The Charges, Potential Penalties, and Case Status**

1. On April 30, 2019, a federal grand jury seated in Las Vegas, Nevada returned a three-count Indictment charging three defendants – JOSE LUIS REYNALDO REYES-CASTILLO, a.k.a. "Modesto," MIGUEL TORRES-ESCOBAR, a.k.a. "Camail," and DAVID ARTURO PEREZ-MANCHAME, a.k.a. "Walter Melendez," a.k.a. "Herbi" — with offenses related to the January 21, 2018 murder of Arquimidez Sandoval-Martinez. (ECF No. 1). More specifically, all three defendants are charged with Murder in Aid of Racketeering (VICAR Murder), in violation of Title 18, United States Code, Sections 1959(a)(1) and 2 (Count One); Using, Carrying, and Discharging a Firearm During and In Relation to a Crime of Violence, in violation of Title 18, United States Code, Sections 924(c) (Count Two); and Causing Death Through the Use of A Firearm, in violation of Title 18, United States Code, Sections 924(j) and 2 (Count Three).

2. Counts One and Three are both death penalty eligible offenses. Count Two carries a mandatory minimum penalty of 10 years' imprisonment and a statutory maximum penalty of life imprisonment.

3. The Indictment alleges that the defendants were members and associates of the criminal street gang Mara Salvatrucha, commonly known as MS-13, and the Parkview clique in Las Vegas, Nevada, specifically. The Indictment further alleges that MS-13, including its leaders, members, and associates, constituted an enterprise which engaged in racketeering activity consisting of multiple acts involving murder, kidnapping, and robbery, among other offenses.

4. The discovery in this case will be voluminous. It includes, but is not limited to, thousands of pages of documents, including the complete "murder book", investigative reports from both federal and state agencies, court documents, photographs, medical examiner reports, summaries and/or transcripts of multi-hour interviews with various individuals (several of which involve Spanish speakers and are in the process of being translated), toll records, forensic reports and related data, social media records, and other such materials; multiple audio and video recordings; and items of physical evidence, including clothing, knives, firearms, and other such items.

2

5.      On September 26, 2019, the Court granted the parties motion for a protective order governing discovery. (ECF No. 41 & 42).

6.      On or about October 15, 2019, the Government produced initial discovery involving its "murder book" for the Sandoval-Martinez murder as set forth in paragraph 4, above. The defendants have begun reviewing this discovery and will require substantial additional time in order to thoroughly review the discovery, conduct any necessary follow-up investigation, apprise their clients of the nature of the evidence against them, and research, prepare, and file any necessary pretrial motions that defense counsel deem necessary given the evidence and posture of the case. Counsel will also need to review discovery in order to make an informed decision as to whether to seek a plea agreement.

7.      A number of counsel in this case, including both counsel for defendant Perez-Manchame and learned counsel for defendant Torres-Escobar, represented parties in *United States v. Palafox, et. al.*, No. 2:16-CR-0265-GMN. That trial began on July 29, 2019 and concluded with the jury verdict on February 24, 2020. ECF Nos. 1756, 2156.

8.      Moreover, all three defendants are charged with death penalty eligible offenses. Whether the government decides to seek death or seek approval not to seek death, such requires compliance with death penalty protocol processes which will be time-consuming and will require participation of counsel for each defendant with regard to presenting mitigating information. Defense counsel will need sufficient time to accumulate mitigation information to present to the United States Attorney and the Attorney General of the United States.

9.      On March 16, 2020, the Chief Judge of the U.S. District Court for the District of Nevada issued Temporary General Order 2020-03, which found that due to the outbreak of the coronavirus disease 2019 ("COVID-2019") in the District of Nevada, the declaration by the Governor of the State of Nevada of a public health emergency due to the spread of COVID-19 in Nevada, and the declaration of local emergencies by local governments due to COVID-19, including Clark County, the Court has sustained "reduced ability to obtain an adequate spectrum of jurors," and it noted the effects of public health recommendations, including "social distancing measures."

1  General Order 2020-03 accordingly continued all civil and criminal trials until April 10, 2020, pending further order of the Court and found that "the ends of justice are best served by ordering the continuances, which outweighs the best interests of the public and any defendant's right to a speedy trial under 18 U.S.C. § 3161(h)(7)(A)."

10. On March 19, 2020, the Chief Judge of the U.S. District Court for the District of Nevada issued Temporary General Order 2020-04, which noted that "the COVID-19 pandemic has continued to spread," resulting in the need for "more aggressive social-distancing measures." The Court noted further that, "[o]n March 17, 2020, the Governor of the State of Nevada ordered the closure of many business establishments and strongly encouraged all citizens to stay home." Accordingly, the Court ordered the temporary closure of the Clerk's office, and implemented other changes, including "striving to eliminate in-person court appearances." In the event any hearing must go forward, the Court will conduct the hearing via video or teleconference. The Court will vacate or amend Temporary General Order 2020-04 no later than April 30, 2020.

11. On March 30, 2020, the Chief Judge of the U.S. District Court for the District of Nevada issued Temporary General Order 2020-05, which noted that "the Judicial Conference of the United States found that emergency conditions due to the national emergency declared by the President have affected and will materially affect the functioning of the federal courts generally." The Court noted further that felony pleas and sentencings could not be conducted in person without "seriously jeopardizing public health and safety" and should only be held via video conference if postponing the proceeding would cause "serious harm to the interests of justice." This authorization is effective for 90 days.

12. On April 9, 2020, the Chief Judge of the U.S. District Court for the District of Nevada issued Amended Temporary General Order 2020-03 (collectively with General Order 2020-03, "the General Orders"), which amended Temporary General Order 2020-03 by stating that "the Court has determined that jury trials must be further postponed," without indicating how long the postponement will continue. Temporary General Order 2020-03 (Amended) states that "each presiding judge will address any needed continuance of their trial in their individual cases."

13. While the Nevada State Governor has not yet extended his stay at home order beyond April 30, 2020, it is notable that the cities of New York City, Los Angeles and Washington D.C. have extended similar restrictions to May 15, 2020. Undersigned defense counsel note that a recent declaration authored by the Director and Chief Counsel of the American Bar Association Death Penalty Representation Project sets forth the following with respect to in-person interviews in the context of a death penalty eligible prosecution:

> The [ABA] Guidelines also make clear that in-person interviews with the client, witnesses, and family members are at the core of any adequate investigation. Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. ... Remote technology options such as video conferencing and phone calls do not provide an alternative for capital defenders, mitigation specialists, experts, or investigators.

*See* Exhibit A, Declaration of Emily Olson-Gault, Esq., pp. 4-5, ¶ 23 (internal quotations omitted).

14. Given the charges, the potential penalties, the demands of the 7 month *Palafox, et. al.* jury trial on a number of the counsel in this case, and the current public health emergency caused by the COVID-19 pandemic, it would be unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits previously ordered. Therefore, the parties request that the Court amend the complex case schedule as proposed below.

**B.     Proposed Complex Case Schedule**

    **i.     The Initial Discovery Phase**

The parties propose that the government shall confer and meet the obligation to disclose and provide the following:

    a.     all statements of the respective defendants, as well as documents, objects, audio and video recordings, expert reports, and anything else required to be disclosed under Federal Rule of Criminal Procedure 16(a)(1)(A)-(F);

    b.     all search warrants and other court orders that relate to evidence that may be offered at trial;

c.   all police or investigative reports that are relevant and material to the charges in the Indictment;

d.   each respective defendant's criminal record, if applicable;

The Government has acknowledged its continuing duty to disclose additional evidence that is discovered subsequent to the initial production, pursuant to Federal Rule of Criminal Procedure 16(c).

### ii.   The Discovery Motions Schedule to Resolve Any Discovery Disputes and Pretrial Motions Schedule

The parties acknowledge a duty to make good faith efforts to meet and confer with each other to resolve informally any dispute over the scope, manner, and method of disclosures before seeking relief from the Court. A breach of the duty to meet and confer, by either party, may serve as a basis to grant or deny any subsequent motion for appropriate relief made by the Court. If the parties are unable to agree or resolve disputes after good faith efforts to do so, the parties propose the following pretrial motions schedule for both discovery motions and other motions:

a.   Discovery and/or pretrial motions, including notices of any defense under Rules 12.1, 12.2, and 12.3, joinder, and severance under Rule 8 of the Federal Rules of Criminal Procedure, shall be filed on or before **January 11, 2021**;

b.   Response to discovery and/or pretrial motions to be filed on or before **February 8, 2021**;

c.   Replies to responses to discovery and/or pretrial motions are to be filed on or before **March 1, 2021**.

The parties agree and stipulate that they may need to continue the aforementioned dates based on discovery and other extenuating circumstances. The parties will submit any stipulations to continue deadlines as soon as practicable.

### iii.   The Second Discovery Phase

The parties propose that **NO LATER THAN 90 DAYS BEFORE TRIAL**: the government will provide its expert witness disclosures in accordance with Fed. R. Crim. P. 16(a)(1)(G).

**iv.  The Third Discovery Phase**

The parties propose that **NO LATER THAN 60 DAYS BEFORE TRIAL**:

a. the government will identify recordings, transcripts/translations of recordings, or portions thereof, that will be offered in its case-in-chief at trial; and

b. the defendants will provide their expert witness disclosures in accordance with Fed. R. Cri. P. 16(b)(1)(C).

**v.  The Fourth Discovery Phase**

The parties propose that **NO LATER THAN 30 DAYS BEFORE TRIAL**:

a. the defendants will identify recordings, transcripts/translations of recordings, or portions thereof, that will be offered in their respective case-in-chief at trial; and

b. the government will provide disclosures of Brady material and Giglio material.

**vi.  The Fifth Discovery Phase**

The parties propose that **NO LATER THAN 10 DAYS BEFORE TRIAL**:

a. the parties will disclose any summaries, charts or calculations that will be offered in their respective case-in-chief at trial; and

b. the government will disclose any statements of witnesses under Title 18, United States Code, Section 3500, and reports of interviews for those witnesses the Government anticipates possibly calling in its case-in-chief, unless the government files a motion for protective order under Rules 16(d)(1) at the time said statements are due herein.

**vii.  The Sixth Discovery Phase**

The parties propose that **NO LATER THAN THE FIRST DAY OF TRIAL**: each defendant will disclose any statements of witnesses the defendant intends to call in his case-in-chief, unless the defendants file a motion for protective order under Rules 16(d)(1) at the time said statement is due herein.

///

///

///

     **viii.    Supplemental Motions**

The parties agree that any supplemental motion can be filed upon a showing of good cause as determined by the Court. These motions shall be based on issues unforeseen to the parties at the time this agreement was filed.

     **ix.    Trial**

The parties agree that, subject to the schedule and approval of the Court, the setting of a new trial date in Winter 2022. The parties anticipate that trial of the matter will last approximately six to eight weeks, depending on the number of defendants who proceed to trial, and whether or not it is a capital trial.

## II. CONCLUSION RE: COMPLEXITY

For the foregoing reasons, it is in the interest of the defendants, their respective counsel, and the Government to modify the normal trial time limits established by Title 18, United States Code, Section 3161, and the initial complex case scheduling order. Complicated and voluminous motions are anticipated requiring additional time for the parties to research applicable law and respond. Additionally, the Court may have to review, consider, and rule on all such motions and responses. All parties, including the Court, have an interest in seeing this case presented in an efficient and well-organized manner during both the discovery and trial phases. This will ensure the evidence is presented to a jury without unnecessary and time-consuming delays. Accordingly, the parties agree that all time from the arraignment and plea until such time as the Court shall rule otherwise should be excluded for purposes of speedy trial calculations, pursuant to 18 U.S.C. §§ 3161(h)(7)(A) and (h)(7)(B)(i)-(ii). The exclusion is appropriate because of the nature and complexity of the prosecution as well as the number of defendants. The exclusion is also appropriate because the failure to grant such a continuance in the proceedings would be likely result in a miscarriage of justice. The ends of justice served by this exclusion of time far outweigh the interest that the public and the defendants have in a speedy trial.

WHEREFORE, PREMISES CONSIDERED, the defendants respectfully requests this Court to continue to certify this cause as a complex case, therefore tolling the time limits under the Speedy

Trial Act, Title 18, United States Code, Section 3161, and to amend the initial scheduling order as set forth herein and as it may deem appropriate, considering the matters stated herein.

Dated: April 21, 2020.   Respectfully submitted,

NICHOLAS A. TRUTANICH
United States Attorney

*/s/ Shaheen P. Torgoley*
SHAHEEN P. TORGOLEY
Assistant U.S. Attorney

DAVID L. JAFFE
Chief, Organized Crime & Gang Section
U.S. Department of Justice

*/s/ Jeremy Franker*
JEREMY FRANKER
CHRISTOPHER TAYLOR
Trial Attorneys

*/s/ John Balazs*
RICHARD A. WRIGHT
JOHN BALAZS
Counsel for defendant
JOSE LUIS REYES-CASTILLO

*/s/ Amy E. Jacks*
MICHAEL J. MICELI
AMY E. JACKS
Counsel for defendant
MIGUEL TORRES-ESCOBAR

*/s/ Michael J. Kennedy*
ANDREA L. LUEM
MICHAEL J. KENNEDY
Counsel for defendant
DAVID ARTURO PEREZ-MANCHAME

IT IS SO ORDERED:

_____   4-21-2020
CAM FERENBACH                Date
United States Magistrate Judge

9

**CERTIFICATE OF SERVICE**

The undersigned certifies that he is a person of such age and discretion as to be competent to serve papers and that he served a copy of the foregoing through the Electronic Filing System to all parties.

            */s/ Michael Kennedy*
            Law Offices of Michael Jerome Kennedy, PLLC

# Exhibit A

# DECLARATION OF EMILY OLSON-GAULT, ESQ.

1. I, the undersigned declarant, Emily Olson-Gault, am over eighteen years of age and competent to testify to the statements contained in this Declaration. I am an attorney licensed to practice law in the State of New York and the U.S. Supreme Court. I am the Director and Chief Counsel of the American Bar Association Death Penalty Representation Project, which is based in Washington, D.C.

2. The American Bar Association ("ABA") created the Death Penalty Representation Project (the "Project") in 1986 to address the lack of qualified counsel available to those facing a death sentence.

3. The ABA and the Project do not take a position on the death penalty itself. The Project is committed to ensuring that basic constitutional protections have been provided to all individuals who are charged with a capital crime or sentenced to death. To this end, the Project promotes policies and procedures that will guarantee that all those facing execution are represented at every stage of the proceedings.

4. The ABA has promulgated Guidelines that govern the appointment and performance of defense counsel in death penalty cases. The Project is sometimes asked to provide affidavits in death penalty cases about the ABA Guidelines and standards for representation, and it does so not to advantage a particular litigant but to ensure that basic constitutional protections and due process have been provided to all individuals facing a death sentence.

5. The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter "ABA Guidelines" or "Guidelines"), first adopted in 1989, were revised and updated in 2003 so that they would accurately reflect current death penalty law and practice. 31 HOFSTRA L. REV. 913 (2003), *available at* http://ambar.org/2003guidelines. The Death Penalty Representation Project led the effort to revise and update the Guidelines. The ABA House of Delegates approved the revised ABA Guidelines in February 2003.

6. After the revision of the ABA Guidelines in 2003, the Project and other organizations developed the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases (hereinafter "Supplementary Guidelines") to address the urgent need to help defense counsel understand how to supervise the development of mitigation evidence and direct a key member of the defense team, the mitigation specialist. The Supplementary Guidelines are a complementary extension of the ABA Guidelines. They serve to spell out important features of the existing standards of practice that enable mitigation specialists and defense attorneys to work together effectively to uncover and develop evidence that humanizes the client. *See* Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 679 (2008).

7. The ABA Guidelines and Supplementary Guidelines have been cited favorably in nearly 400 state and federal capital appellate decisions, including the United States Supreme Court.

*See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366-67 (2010) ("We long have recognized that '[p]revailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable ...'" (citing *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam)); *Florida v. Nixon*, 543 U.S. 175, 191, 191 n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). *See also* ABA Death Penalty Representation Project, *List of Cases Citing the Guidelines* (Mar. 23, 2020), available at https://www.americanbar.org/content/dam/aba/administrative/death_penalty_representation/allcites.pdf.

8. The Guidelines have been adopted in substantive part or officially acknowledged as an accurate description of the standard of care for defense representation in death penalty cases by organizations such as the State Bar of Texas, the Department for Public Advocacy for the Commonwealth of Kentucky, the Idaho Public Defender Commission, the Georgia Public Defender Standards Council, and numerous others. The ABA Guidelines have also been adopted in substantive part by state legislative action or court rule in Louisiana, Nevada, and Arizona. *See* ABA Death Penalty Representation Project, *Implementation Fact Sheet* (Jul. 2018), available at https://www.americanbar.org/content/dam/aba/administrative/death_penalty_representation/ImplementationFactSheetJul2018.pdf.

9. The ABA Guidelines did not themselves create the national standard of care for capital representation; rather they simply codified long-standing norms of capital defense practice in the United States. *See Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003) ("the [ABA Guidelines] merely represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases.").

10. The Guidelines are intended to provide guidance to judges and capital defense counsel regarding the skills and training death penalty counsel must possess when representing a person charged with a capital crime.

11. All capital cases require exceptional time and efforts simply due to the nature of the proceedings. *See* Guideline 1.1, Commentary at 923 ("'Every task ordinarily performed in the representation of a criminal defendant is more difficult and time-consuming when the defendant is facing execution.' . . . Due to the extraordinary and irrevocable nature of the penalty, at every stage of the proceedings counsel must make 'extraordinary efforts on behalf of the accused'" (quoting, first, Douglas W. Vick, *Poorhouse Justice: Underfunded Indigent Defense Services and Arbitrary Death Sentences*, 43 BUFF L. REV. 329, 357-58 (1995) and, second, ABA Standards for Criminal Justice: Defense Function, Standard 4-1.2(C), (3d ed. 1993)). The need for time and resources to prepare the defense is due in part to the tremendous amount of investigation that the capital team must complete to adequately represent a person facing a death sentence.

12. In my position as Director of the Project, I am in frequent contact with capital defenders and pro bono attorneys to discuss and assist with issues related to capital representation.

13. During the month of March 2020, I have spoken with capital defenders and pro bono attorneys all over the United States as they attempt to cope with the unprecedented situation

created by the COVID-19 global pandemic. My understanding from these conversations is that most capital defense teams are unable to conduct the large majority of the investigation and expert work required in capital representation (*see* ¶¶17-29, *infra*). This is due to restrictions set in place by state and local governments, as well as departments of corrections and institutional defender offices and law firms, out of a concern for public health and the welfare of employees. As a result, the time available to capital trial teams has been truncated significantly because of health concerns related to COVID-19.

14. Time is a scarce resource in all capital representation. The Guidelines recognize that the period of time prior to a capital trial is one of the most critical for development of the case and legal strategy. Guideline 1.1 notes that effective advocacy in early stages of a capital case "enabl[es] counsel to counsel his or her client and to obtain information regarding guilt that may later become unavailable" and "[t]hus, it is imperative that counsel begin investigating mitigating evidence and assembling the defense team as early as possible . . . ." Guideline 1.1, History of Guideline, at 920. *See also* Guideline 10.2, Commentary, at 994 ("early investigation to determine weaknesses in the State's case and uncover mitigating evidence is a necessity . . ."); Guideline 10.7, Commentary, at 1023 ("The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations.").

15. When the time to perform these essential functions is truncated, whether by operation of the legal system or by something wholly external like a natural disaster, counsel will not have adequate time to prepare their case and this, in turn, jeopardizes due process and fairness in capital cases. *See* ABA Guideline 6.1, Commentary, at 969 ("Regardless of the context, no system that involves burdening attorneys with more cases than they can reasonably handle can provide high quality legal representation. In the capital context, no such system is acceptable.").

16. The Guidelines' description of the nature of investigation required in capital cases provides insight into the extraordinary need for time in all capital proceedings.

17. Capital defense counsel and their team must conduct thorough, independent investigations related to both the guilt and penalty phases of the trial. See ABA Guideline 10.7(A). This requirement is ironclad; an admission of guilt by the client, the client's direction not to investigate, or any other extenuating circumstances do not change or lessen counsel's obligations in this area. *See* ABA Guideline 10.7(A)(1)-(2). ABA Guideline 10.10.1 recognizes that defense counsel must be afforded the time not only to investigate and obtain discovery, but also to shape the fruits of the investigation into a comprehensive strategy governing each facet of the trial and pre-trial proceedings. To avoid credibility-damaging inconsistencies between the guilt and penalty phases, "it is critical that, well before trial, counsel formulate an integrated defense theory." ABA Guideline 10.10.1, Commentary, at 1047.

18. As part of the requisite investigation, capital cases also require comprehensive, multi-generational psychosocial history construction based on "exhaustive investigation." ABA Guideline 4.1, "Defense Team and Supporting Services," Commentary, at 959. These histories must extend back at least three generations in the defendant's family. *See also* Supplementary Guideline 10.11(E)(2)(a).

19. The areas for investigation include: (1) medical history, including "hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage;" (2) family and social history; (3) educational history; (4) military service; (5) employment and training history; and (6) prior juvenile and adult correctional experience. Guideline 10.7, Commentary, at 1022-23. *See also* Supplementary Guideline 10.11(B) (listing the same areas enumerated by the ABA Guidelines and further adding "multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; . . . religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.")

20. The areas for investigation listed in ABA Guideline 10.7 are not intended to be exhaustive, and the Guidelines explicitly contemplate additional investigation for other legal issues: "Additional investigation may be required to provide evidentiary support for other legal issues in the case . . . Whether within the criminal case or outside it, counsel has a duty to pursue appropriate remedies if the investigation reveals that such conditions exist." Guideline 10.7, Commentary, at 1027. *See also* Supplementary Guideline 10.11(B) ("The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death.").

21. The ABA Guidelines outline a dual-track approach to conducting this investigation, requiring both witness interviews and records collection. *See* Guideline 10.7, Commentary, at 1024 ("It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers and others" and "[r]ecords—from courts, government agencies, the military, employers, etc. . . . should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children.")

22. Simply locating a single source for this information is often insufficient. The Guidelines recognize that "[t]he collection of corroborating information from multiple sources—*a time-consuming task*—is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence." ABA Guideline 10.7, Commentary, at 1025 (emphasis added).

23. The Guidelines also make clear that in-person interviews with the client, witnesses, and family members are at the core of any adequate investigation: "Team members must

conduct *in-person, face-to-face, one-on-one interviews* with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation." Supplementary Guideline 10.11(C) (emphasis added). *See also* ABA Guideline 10.5, Commentary, at 1008 ("Even if counsel manages to ask the right questions, a client will not—with good reason—trust a lawyer who visits only a few times before trial, does not send or reply to correspondence in a timely manner, or refuses to take telephone calls."). Remote technology options such as video conferencing and phone calls do not provide an adequate alternative for capital defenders, mitigation specialists, experts, or investigators.

24. This time-intensive, in-person contact is essential for establishing a relationship of trust with the client, client's family, and other witnesses, which is indispensable to effective representation. *See* Supplementary Guideline 10.11(C) ("Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding."); ABA Guideline 10.5 and Commentary, at 1008 ("Client contact must be ongoing, and *include sufficient time spent at the prison to develop a rapport between attorney and client*.") (emphasis added).

25. In-person visits with the client and client's family are also a crucial tool in dictating the defense team's choices regarding necessary mental health screening and experts, which are especially important given the near-ubiquity of mental health issues in capital cases. Defense counsel's observations of the client's mental state are a necessary piece of the puzzle, as are the observations of a member of the defense team specifically trained to screen for disorders and recommend follow-up investigation and appropriate experts. *See* ABA Guideline 4.1, Commentary, at 956. In many cases, the results of such observation render a "psychologist or other mental health expert [] a needed member of the defense team." ABA Guideline 10.4, Commentary, at 1004.

26. The mental health services provided as a result of observations and screenings are also oftentimes necessary to ensure that a client is "cognitively and emotionally competent to make sound decisions concerning his case." ABA Guideline 4.1, Commentary, at 959. Moving capital proceedings forward while in-person visits cannot take place prevents counsel from ensuring that the client is competent.

27. Additionally, expert evaluations of the client are time-consuming, particularly for issues related to intellectual disability and mental illness or competency. *See* ABA Guideline 4.1, Commentary, at 956 ("Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process."). In order to ensure the heightened reliability of such evaluations, a thorough investigation must first be conducted. *Id.* ("Counsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary."); *see also*

        ABA Guideline 4.1, Commentary, at 959 (the mitigation specialist "provides social history information to experts to enable them to conduct competent and reliable evaluations"). Judgment calls regarding which expert evaluations are recommended are necessarily the product of in-person visits between the client and the defense team and are informed by a comprehensive and thorough investigation. *See* ¶¶25-26, *supra*.

28. The investigation is also a necessary precursor to making key strategic decisions and preparing pleadings. *See* ABA Guideline 10.7, Commentary, at 1021 ("Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case.").

29. Similarly, the investigation informs voir dire, which is necessarily time-intensive. The Guidelines make clear that counsel must "devote substantial time" to preparation for jury selection. ABA Guideline 10.10.2, Commentary, at 1051. Given the importance of "choosing a jury most favorable to the theories of mitigation that will be presented," *id*., appropriate voir dire preparation can only occur once the defense team has completed its rigorous investigative duties.

30. The norms of practice reflected in the ABA Guidelines are not aspirational. *See* Guideline 1.1, Commentary, at 920. They represent the minimum requirements for adequate representation. If counsel lacks adequate time to prepare their case, or if defense counsel, mental health experts, investigators and mitigation specialists are unable to conduct in-person meetings and interviews to discharge the duties outlined in ¶¶17-29 above, fundamental fairness and accuracy are put at risk.

31. As the Guidelines have recognized, the provision of effective representation at trial is essential to due process in capital cases. In mandating the provision of high quality legal representation at the trial level of a capital case, [the Guidelines] recognize[] the simple truth that any other course has weighty costs—to be paid in money and delay if cases are reversed at later stages or in injustice if they are not." ABA Guideline 1.1, Commentary, at 930.

32. The ABA Guidelines are the most authoritative and up-to-date articulation of the investigative and other responsibilities of capital defense counsel. The American Bar Association believes that meeting these responsibilities is essential to ensuring justice in capital cases.

I hereby swear under penalty of perjury that the above and foregoing is a true and correct statement.

Dated this 2nd day of April, 2020.

                                                  Emily Olson-Gault