UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br>vs.<br><br>JOSE LUIS REYNALDO REYES-CASTILLO, *et al.*,<br><br>                    Defendants. | Case No.: 2:19-cr-00103-GMN-MDC<br><br>**ORDER GRANTING, IN PART, AND DENYING, IN PART, MOTION FOR RECONSIDERATION** |

Pending before the Court is the Motion for Reconsideration, (ECF No. 270), filed by Defendant Jose Luis Reynaldo Reyes-Castillo. The Government filed a Response, (ECF No. 274). Reyes-Castillo did not reply. For the reasons discussed below, the Court **GRANTS, in part, and DENIES, in part,** Reyes-Castillo's Motion for Reconsideration.

I.     **BACKGROUND**

Reyes-Castillo and his Co-Defendants face charges for Murder in Aid of Racketeering, RICO conspiracy, and related counts. (*See* Third Superseding Indictment, ECF No. 223). Reyes-Castillo moves to dismiss the indictments in this case, arguing that the Grand Juries that indicted him and his Co-Defendants were not drawn from a fair cross section of the community (*See generally* Mot. Dismiss, ECF No. 159). Defendants David Arturo Perez-Manchame and Alexander De Jesus Figueroa-Torres joined the Motion to Dismiss Indictment. (*See* Joinders, ECF Nos. 160, 164).

Magistrate Judge Couvillier entered a Report and Recommendation ("R&R") recommending that the Motion to Dismiss Indictment be denied. (*See* R&R, ECF No. 241). The Parties had five days to file an Objection to the R&R, and none did so by the deadline, but

Reyes-Castillo filed a late Objection, (ECF No. 247).[1]  The Court denied the Objection as untimely, accepted and adopted the R&R in full, and denied Reyes-Castillo's Motion to Dismiss Indictment and the Co-Defendants' Joinders. (*See* Min. Order, ECF No. 263).  Reyes-Castillo now moves the Court to reconsider that Order. (*See* Mot. Reconsideration, ECF No. 270).

## II.     LEGAL STANDARD

Although the Federal Rules of Criminal Procedure do not expressly authorize the filing of motions for reconsideration, "numerous circuit courts have held that motions for reconsideration may be filed in criminal cases." *United States v. Hector*, 368 F. Supp. 2d 1060, 1063 (C.D. Cal. 2005), *rev'd on other grounds*, 474 F.3d 1150 (9th Cir. 2007); *see also United States v. Martin,* 226 F.3d 1042, 1047 (9th Cir. 2000).  Many courts have looked to analogous civil rules when invoking their authority to rule on a motion to reconsider in the criminal context. *See, e.g.*, *United States v. Ramos-Urias*, No. 18-CR-00076-JSW-1, 2019 WL 1567526, *1 (N.D. Cal. Apr. 8, 2019), *vacated and remanded on other grounds*, No. 19-10138, 2023 WL 3051889 (9th Cir. Apr. 24, 2023) (citation omitted) ("In the context of criminal cases, motions to reconsider are 'governed by the rules that govern equivalent motions in civil proceedings.'"); *United States v. Vasquez*, No. CR 2:11-101 WBS, 2014 WL 2548638, at *1 (E.D. Cal. June 5, 2014) ("In assessing motions for reconsideration in criminal cases, some courts have relied on the standard that governs motions for reconsideration under Federal Rule of Civil Procedure 59.").  The Court will, likewise, utilize FRCP 59 for guidance in this matter.

Pursuant to FRCP 59, a district court may grant a motion for reconsideration only when: (1) it is presented with newly discovered evidence; (2) it has committed clear error, or the

---

[1] During the February 18, 2025, hearing, all defendants, including Reyes-Castillo, agreed to a modified briefing schedule.  Accordingly, the Magistrate Judge set an expedited schedule to make R&R objections due five days after receiving notice of an R&R. (*See* Min. Order, ECF No. 189).  The R&R was filed March 7, 2025, and all Parties received electronic notice that day.  Thus, Defendant Reyes-Castillo's Objection was untimely when it was filed on March 21, 2025.

initial decision was manifestly unjust; or (3) there has been an intervening change in controlling law. *Nunes v. Ashcroft*, 375 F.3d 805, 807 (9th Cir. 2004); *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). Further, a "Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona*, 229 F.3d at 890. "A party seeking reconsideration . . . must state with particularity the points of law or fact that the court has overlooked or misunderstood. Changes in legal or factual circumstances that may entitle the movant to relief also must be stated with particularity." L.R. 59-1. "Motions for reconsideration are disfavored." *Id.*

### III. DISCUSSION

Reyes-Castillo does not indicate which of the limited grounds he relies upon in bringing his motion, nor does he articulate any legal standard. (*See generally* Mot. Reconsideration). He disagrees with the Court's decision to deny his Objection to Magistrate Judge Couvillier's R&R as untimely, explains that he inadvertently filed his Objection to the R&R late, and requests that the Court reconsider his Objection on the merits. (*Id.*). The Government opposes his Motion for Reconsideration arguing that Reyes-Castillo's Motion is not based on any newly discovered facts, law, or evidence. (Resp. to Obj. 3:10–11, ECF No. 274). It further argues that there was no clear error in the initial decision, nor was it manifestly unjust. (*Id.* 3:11–12). And lastly it contends that there has been no intervening change in controlling law. (*Id.* 3:12–13).

Despite the many deficiencies of the Motion for Reconsideration, and the fact that Reyes-Castillo filed his Objection late, the Court exercises its discretion to address his Objection on the merits. Importantly, the Objection is fully briefed, and the Court finds good cause to re-analyze the arguments put forth by Reyes-Castillo in his Motion to Dismiss Indictment because of a mathematical error found in the Motion to Dismiss Indictment that was corrected in the Objection.

A party may file specific written objections to the findings and recommendations of a United States Magistrate Judge made pursuant to Local Rule IB 1-4. 28 U.S.C. § 636(b)(1)(B); D. Nev. R. IB 3-2. Upon the filing of such objections, the Court must make a *de novo* determination of those portions to which objections are made. *Id.* The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); D. Nev. R. IB 3-2(b).

Magistrate Judge Couvillier recommends the denial of Reyes-Castillo's Motion to Dismiss Indictment for substantial underrepresentation of distinctive groups in the grand jury pool under the Fifth and Sixth Amendments and the Jury Service and Selection Act. (*See generally* R&R). The Magistrate Judge first concludes that Reyes-Castillo did not show a substantial underrepresentation of Latinos, African Americans, and men to make out a prima facie case of discrimination. (*Id.* 7:10–12). The Magistrate Judge also finds that even if he had demonstrated sufficient underrepresentation, Reyes-Castillo fails to show that the underrepresentation is the result of systemic factors in the jury selection process. (*Id.* 7:19–21). Finally, the Magistrate Judge recommends that Reyes-Castillo's Fifth Amendment equal protection claim be denied because he has not demonstrated discriminatory intent. (*Id.* at 5:14–15). Reyes-Castillo objects to all of Magistrate Judge Couvillier's recommendations. (Obj. 2:12–17, ECF No. 247).

**A. Fifth Amendment Equal Protection Clause**

Magistrate Judge Couvillier correctly articulated the legal standard as applied to Reyes-Castillo's Fifth Amendment claim. Under the equal protection component of the Due Process Clause of the Fifth Amendment, a jury selection process cannot discriminate against a protected class. *Castaneda v. Partido*, 430 U.S. 482, 493 (1977). To show a prima facie case, a defendant must (1) "establish that the group, of which [he] is a member, is 'one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or

1  applied;'" (2) "prove the degree of underrepresentation 'by comparing the proportion of the
2  group in the total population to the proportion called to serve as grand jurors, over a significant
3  period of time;'" and (3) demonstrate "discriminatory intent." *United States v. Esquivel*, 88
4  F.3d 722, 725 (9th Cir. 1996) (quoting *Castaneda*, 430 U.S. at 494).

5  When analyzing the degree of underrepresentation, the Ninth Circuit Court of Appeals
6  has described a range of statistical models used by courts. Importantly the Ninth Circuit
7  abandoned the absolute disparity approach as the exclusive method used by the Circuit. *United*
8  *States. v. Hernandez-Estrada*, 749 F.3d 1154, 1164 (9th Cir. 2014) (*en banc*). In so doing, the
9  Ninth Circuit "decline[d] to confine district courts to a particular analytical method," but rather
10  recognized that "the appropriate test or tests to employ will largely depend on the particular
11  circumstances of each case." *Id.* (noting that for jury composition analysis, the court may
12  consider different statistical tools such as the absolute disparity test, the comparative disparity
13  test, and standard deviation analysis). Proof of discriminatory intent is "the most crucial factor
14  in an equal protection case." *Id.* at 1167.

15  **1. Underrepresentation**

16  Reyes-Castillo does not object to the Magistrate Judge's determination that he and his
17  Co-Defendants are members of a protected class. Thus, the first element of the equal protection
18  analysis is met, and the Court begins its *de novo* review with the second element:
19  underrepresentation. *See Esquivel*, 88 F.3d at 725.

20  This element "requires proof, typically statistical data, that the jury pool does not
21  adequately represent the distinctive group in relation to the number of such persons in the
22  community." *Hernandez-Estrada*, 749 F.3d at 1159 (quotation omitted). The Ninth Circuit
23  does "not prescribe an . . . exclusive analysis to be applied in every case," because some
24  analyses may be unsuitable in certain circumstances. *Id.* at 1164. Indeed, "[a]llowing courts
25  and defendants to use a more robust set of analytical tools will ensure more accurate, and

1  narrowly tailored, responses to individual [jury composition] challenges." *Id*. at 1165.  To
2  analyze jury composition, there are at least two statistical tools typically recognized by the
3  Ninth Circuit: absolute disparity[2] and comparative disparity.[3]
4      In his Motion to Dismiss Indictment, Reyes-Castillo argues that Latinos and men are
5  significantly underrepresented in the grand jury pool under the comparative disparity analysis
6  and the standard deviation analysis. (Mot. Dismiss 12:21–22).  He relies on expert testimony
7  from Statistical Consultant Jeffrey Martin to support his assertions. (*See generally id.*).  The
8  Magistrate Judge found that Reyes-Castillo did not show statistically significant
9  underrepresentation under either the absolute disparity or comparative disparity analyses. (R&R
10 7:2–3).  Reyes-Castillo argues that the Magistrate Judge was wrong. (Obj. 4:4–5).

    **a. Absolute Disparity Analysis**

    Under Martin's absolute disparity analysis, on the qualified jury wheel: (1) Latinos are
underrepresented by 3.90%; and (2) men are underrepresented by 3.25%. (*See* Obj. at 5 n.2).
The Ninth Circuit has declined to find underrepresentation of a distinctive group in cases where
the absolute disparity of that group's representation is 7.7% or lower. *Hernandez-Estrada*, 749
F.3d at 1161.  The respective disparities here are 3.90% and 3.25%.  Thus, Reyes-Castillo has
not met his burden of showing significant underrepresentation to establish discrimination under
the absolute disparity test.

---

[2] The absolute disparity test takes "the difference between the percentage of a distinctive group in the community and the percentage of that group in the jury pool." *United States v. Rodriguez-Lara*, 421 F.3d 932, 943 (9th Cir. 2005).  This test is better applied to larger population groups because it fails to consider population size resulting in disparate results among smaller population groups. *Hernandez-Estrada*, 749 F.3d at 1161 ("if a minority group makes up less than 7.7% of the population in the jurisdiction in question, the group could never be underrepresented in the jury pool, even if none of its members would end up on the qualified jury pool.").

[3] "Comparative disparity is calculated 'by taking the absolute disparity percentage and dividing it by the percentage of the distinctive group in the total population.'" *Hernandez-Estrada*, 749 F.3d. at 1162 (quotation omitted).  This test "illustrates . . . the comparative differences in a manner that takes population size into consideration." *Id.* at 1163.  Nonetheless, in some cases, the comparative disparity test can overstate a group making up an extremely small percentage of the population. *See id.* (suggesting that a group representing just 0.1% of the population would render the comparative disparity test useless).

### b. Comparative Disparity Analysis

Next, under Martin's comparative disparity analysis,[4] on the qualified jury wheel: (1) Latinos are underrepresented by 17.12% (3.90% / 22.78%), and (2) men are underrepresented by 6.50% (3.25% / 50.02%). (*See* Obj. at 5 n.2). The Ninth Circuit has not set a determinative threshold for a comparative disparity analysis to show significant underrepresentation of a distinctive group, so the Court looks to other circuits for persuasive guidance. In so doing, the Court finds that the values Martin identifies are within the range of comparative disparities that federal courts across the country have deemed acceptable for groups that comprise comparable portions of the relevant community. *See, e.g, Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 268–69 (3d Cir. 2019) (noting absolute disparity of 5.83% for African Americans in jury venire, while census data indicated that 10.7% of adult population in county was African American, resulting in comparative disparity of 54.49% which did not establish a prima facie violation); *United States v. Chanthadara*, 230 F.3d 1237, 1256–57 (10th Cir. 2000) (noting absolute disparity of 1.60% for Hispanics within master jury wheel, while 2.74% of adult population was Hispanic, and holding that a comparative disparity of 58.39% did not establish a prima facie violation); *United States v. Shinault*, 147 F.3d 1266, 1273 (10th Cir. 1998) (noting absolute disparity of 0.76% for Asians among venire members, while 1.27% of adult population was Asian, resulting in comparative disparity of 59.84% which did not establish a prima facie violation, but finding that "considering the small size of each of the groups in relation to the larger community, it is not surprising that the comparative disparity numbers are large"). The arguments presented by Reyes-Castillo in both his Motion to Dismiss Indictment and Objection are not more persuasive to the Court than these cases especially considering that

---

[4] Martin made a calculation error in his initial report, which Defendant Reyes-Castillo corrects in his objection. The numbers used in this Order are reflective of the correction.

the relevant disparities here are much less than the examples in the cited cases. Thus, Reyes-Castillo has not met his burden of showing significant underrepresentation to establish discrimination under the comparative disparity test either.

### c. Combination of Comparative Disparity Analysis and Standard Deviation

Lastly, Reyes-Castillo argues that the Court should combine the comparative disparity test with a standard deviation test[5] to find that the underrepresentation of these distinctive groups is sufficient to present a prima facie case of discrimination. (Mot. Dismiss 9:8–9). The Ninth Circuit permits courts to use the analytical methods most appropriate to the circumstances, which Defendant contends includes a combination of the comparative disparity and standard deviation analyses. *Hernandez-Estrada*, 749 F.3d at 1164–65. Under this combination analysis, Martin's findings show that Latinos are underrepresented by 17.12% (3.90% / 22.78%), more than seven standard deviations, and (2) men are underrepresented by 6.50% (3.25% / 50.02%), which is more than five standard deviations. (*See* Obj. at 5 n.2). According to Martin, "[i]f there is no systematic under or over-representation of a distinctive group, the divergence of demographics should exceed two standard deviations only approximately 5% of the time while the divergence of demographics should exceed three standard deviations only approximately 0.5% of the time." (Martin Report ¶ 30, Ex. A to Mot. Dismiss, ECF No. 159-1); *see also Castaneda*, 430 U.S. at 496 n.17 ("[A]s a general rule[,] if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist."). Indeed, other courts have held that a difference of three standard

---

[5] Standard deviation is the "measure of the predicted fluctuations from the expected value." *Castaneda,* 430 U.S. at 496 n.17. "Standard deviation has the advantage of being firmly grounded in statistical theory, and generally applicable to both large and small population groups." *Hernandez-Estrada*, 749 F.3d at 1163. "Standard deviation analysis allows statisticians to scientifically determine if the under-representation of a distinctive group is statistically significant or not." (Martin Report ¶ 30, Ex. A to Mot. Dismiss, ECF No. 159-1).

deviations is sufficient to find that a minority group is substantially underrepresented in the jury pool. *See, e.g., United States v. Scott*, 545 F. Supp.3d 152, 170 (S.D.N.Y. 2021).

Importantly for the Court's consideration, the Ninth Circuit has not determined the number of standard deviations needed to find that a minority group is substantially underrepresented in the jury pool. And critically, the Ninth Circuit has noted that even if the standard deviation test can detect variation between the community and the jury pool at sufficiently large sample sizes, "[t]he probability that the composition of a jury wheel arose by random selection from the community. . . is not directly related to the defendant's chances of drawing a jury of a certain composition" which is what the fair cross-section requirement ultimately hopes to ensure. *Hernandez-Estrada*, 749 F.3d at 1163. Based on the standards used by social scientists and courts in other circuits, the data suggests that the underrepresentation of these distinctive groups—seven standard deviations for Latinos and five standard deviations for men—*may* be sufficient to establish statistically significant underrepresentation. However, the Ninth Circuit cautions courts who apply this test, and as such the Court cannot conclusively determine whether the standard deviation test as applied to this case, in this Circuit, provides sufficient support to establish significant underrepresentation.

Furthermore, even assuming that the standard deviation test identifies statistical underrepresentation, Martin's findings of more than three standard deviations of variation for each group identified are not legally significant. *See Hernandez-Estrada*, 749 F.3d at 1165 (noting challenger must establish both statistical and legal significance of underrepresentation). Courts that have accepted the value of the standard deviation test have required far greater showings than are present here. *See, e.g., Castaneda,* 430 U.S. at 495–96 (observing, among other measures, that a variation equivalent to 29 standard deviations over an eleven-year period is sufficient to make a prima facie case of unfair underrepresentation); *Ramseur v. Beyer*, 983 F.2d 1215, 1235 (3d Cir. 1992) (finding variation equivalent to 28 standard deviations over a

period of two years to be fair and reasonable); *United States v. Smith*, 457 F. Supp. 3d 734, 743 (D. Alaska 2020) (rejecting variations equivalent to 14 and 16 standard deviations as being legally significant); *see also Hernandez-Estrada*, 749 F.3d at 1174 (Smith, J, concurring) (noting variation equivalent to 14 standard deviations insufficient to establish presumption of systematic exclusion or discriminatory intent). Thus, Reyes-Castillo has not met his burden of showing significant underrepresentation to establish discrimination under a combination of the comparative disparity and standard deviation tests.

### 2. Discriminatory Intent

Reyes-Castillo also argues that the jury selection procedure is not racially neutral because the District of Nevada's decision to solely use voter registration records and exclude many inactive voters creates a presumption of discrimination due to the statistically significant underrepresentation. (Mot. Dismiss 13:3–5). Magistrate Judge Couvillier determined that Reyes-Castillo failed to demonstrate a violation of the Fifth Amendment's equal protection clause because he had not demonstrated discriminatory intent, the most crucial element of the claim. *Hernandez-Estrada*, 749 F.3d at 1167.

Discriminatory intent "may be established by showing that a selection procedure 'is susceptible of abuse or is not racially neutral,' thus supporting the presumption of discrimination raised by the statistical showing under step two." *Esquivel*, 88 F.3d at 725 (citing *Castaneda*, 430 U.S. at 495). "If a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process." *Castaneda*, 430 U.S. at 494 n.13. In determining discriminatory intent, courts must "look at all the facts that bear on the issue, such as the statistical disparities, the method of selection, and any other relevant testimony as to the manner in which the selection process was implemented." *Id.* at 500–01.

Reyes-Castillo's only evidence of discriminatory intent is Martin's conclusion, based on his standard deviation analysis, that the underrepresentation he found is very unlikely explicable by chance. (*See generally* Mot. Dismiss).  Reyes-Castillo argues that the underrepresentation of distinctive groups is the result of at least two systemic factors: (1) the use of only voter registration lists and (2) the selective exclusion of inactive voters in two key counties. (*Id.* 13:3–14:2); (Obj. 7:11–13).  The disparities Reyes-Castillo identifies are not out of the ordinary and, as discussed above, fall within the bounds of what courts have held to be fair and reasonable.  Reyes-Castillo does not make a showing that the process provided by the Jury Selection Plan is "susceptible to abuse or is not racially neutral," given that it is based entirely on objective criteria. *See Esquivel*, 88 F.3d at 727–28.  Moreover, his assertion that the voter lists used to compile the Master Jury Wheel should be supplemented from other sources lacks support because the community is fairly represented within the jury pool, so supplementation is not required. (Mot. Dismiss 11:6–12); *see United States v. Kleifgen*, 557 F.2d 1293, 1296 (9th Cir. 1977) ("In the absence of substantial underrepresentation there is no necessity to supplement voter registration lists.").  Thus, Reyes-Castillo has failed to meet his burden of establishing discriminatory intent.

In sum, Reyes-Castillo has not met his burden of establishing his Fifth Amendment equal protection claim.  As such, the Court DENIES, on the merits, his Objection to the R&R's recommendation on his Fifth Amendment challenge.

**B.  Sixth Amendment and Jury Service and Selection Act Claims**

Magistrate Judge Couvillier also correctly articulated the legal standard as applied to Reyes-Castillo's Sixth Amendment and Jury Service and Selection Act claims.  The Sixth Amendment affords every criminal defendant the right to an impartial "jury drawn from a fair cross section of the community" in which the defendant is tried. *Duren v. Missouri*, 439 U.S. 357, 368 (1979).  The Jury Service and Selection Act extends this constitutional requirement to

the pool from which federal grand jurors are selected.  Under the Jury Service and Selection Act, litigants likewise "have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861.  Under the Act, a "defendant may move to dismiss the indictment or stay the proceedings against him on the ground of a substantial failure to comply with the provisions of [the Act] in selecting the grand or petit jury." 28 U.S.C. § 1867(a).  "Because the same analysis determines whether the jury selection procedures meet the fair cross-section requirement under either the Jury Selection Act or the Sixth Amendment," courts "consider those two claims together." *Hernandez-Estrada*, 749 F.3d at 1158.

To establish a prima facie fair cross-section violation, like Reyes-Castillo alleges here, he must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community"; (2) "that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community"; and (3) "that this underrepresentation is due to systemic exclusion of the group in the jury-selection process." *Duren*, 439 U.S. at 364.  Once a prima facia case is established, the government has the burden to demonstrate a 'significant state interest be manifestly and primarily advanced by those aspects of the jury selection process . . . that result in the disproportionate exclusion of [] distinctive group[s]." *Id.* at 367–68.  Unlike a Fifth Amendment challenge, a fair cross-section challenge does not require the defendants to demonstrate discriminatory intent.

The analysis is largely the same for this claim as it is under the Fifth Amendment.  One difference being that this claim allows for other groups to be considered in the analysis because, unlike a Fifth Amendment claim, it does not require that the defendant be a member of the challenged group. *Compare Esquivel*, 88 F.3d at 725 (quotation omitted) (requiring a defendant to "establish that the group, *of which [he] is a member*, is 'one that is a recognizable, distinct class. . .'") (emphasis added) *with Duren*, 439 U.S. at 364 (requiring a defendant to

establish "that the group alleged to be excluded is a 'distinctive' group in the community."). For that reason, Reyes-Castillo includes statistics for African Americans in his claims under the Sixth Amendment and Jury Service and Selection Act. There is no dispute that the allegedly excluded groups of African Americans, Latinos, and men are distinctive in the community. Because Reyes-Castillo agrees with the Magistrate Judge's finding that the first element of a Sixth Amendment and Jury Service and Selection Act claims is undisputed, the Court once again begins its *de novo* review with the second element.

### 1. Unfair and Unreasonable Representation

The Court concludes above that the underrepresentation of Latinos and men is not significant enough to establish a Fifth Amendment equal protection claim. That analysis is applicable to Defendant's Sixth Amendment claim, which the Court incorporates into this analysis. It now turns to determine whether the underrepresentation of African Americans can establish a Sixth Amendment claim.

#### a. Absolute Disparity Analysis

Under Martin's absolute disparity analysis, on the qualified jury wheel, African Americans are underrepresented by 1.63%. (*See* Obj. at 5 n.2). The Ninth Circuit has declined to find underrepresentation of a distinctive group in cases where the absolute disparity of that group's representation is 7.7% or lower. *Hernandez-Estrada*, 749 F.3d at 1161. The respective disparity here is 1.63%. Thus, Reyes-Castillo has not met his burden of establishing significant underrepresentation to establish a Sixth Amendment violation under the absolute disparity test.

#### b. Comparative Disparity Analysis

Next, under Martin's comparative disparity analysis, on the qualified jury wheel, African Americans are underrepresented by 13.08% (1.63% / 12.43%). (*See* Obj. at 5 n.2). For the reasons discussed above in the Fifth Amendment Claim, Reyes-Castillo has not met his

burden of establishing significant underrepresentation to establish a Sixth Amendment violation under the comparative disparity test either.

### c. Combination of Comparative Disparity Analysis and Standard Deviation

Lastly, Reyes-Castillo argues that the Court should combine the comparative disparity test with a standard deviation test to find that the underrepresentation of these distinctive groups is sufficient to establish a Sixth Amendment violation. (Mot. Dismiss 9:8–9). Here, the standard deviation for African Americans is three standard deviations. But even considering the statistics on this group, Reyes-Castillo has not met his burden of demonstrating significant underrepresentation to establish a Sixth Amendment claim under a combination of the comparative disparity and standard deviation tests for the same reasons discussed above.

### 2. Systemic Exclusion

The Magistrate Judge found that even assuming Reyes-Castillo demonstrated underrepresentation, his showing on the third element—that the underrepresentation is the result of systematic exclusion of distinctive groups—was insufficient. (*See generally* R&R). As explained above in more depth, the disparities Defendant identifies are not out of the ordinary and fall within the bounds of what courts have held to be fair and reasonable.

Moreover, because the Jury Service and Selection Act fair cross-section challenge requires the same analysis as a Sixth Amendment fair cross-section challenge, the Court refers to its analysis above and rejects Reyes-Castillo's Sixth Amendment fair cross-section challenge. The Court agrees with the Magistrate Judge that Reyes-Castillo has similarly failed to demonstrate a substantial Jury Service and Selection Act violation.

In sum, Reyes-Castillo's claims for a Sixth Amendment and Jury Service and Selection Act violation are DENIED.

IV. **CONCLUSION**

**IT IS HEREBY ORDERED** that Defendant Reyes-Castillo's Motion for Reconsideration, (ECF No. 270), is **GRANTED, in part,** and **DENIED, in part**. It is granted to the extent that Reyes-Castillo requested the Court to address his Objection on the merits. It is denied to the extent that even after addressing the merits, the Court maintains its holding denying the Objection, accepting and adopting the R&R in full, and denying Defendant's Motion to Dismiss.

**DATED** this __10__ day of April, 2025.

_____
Gloria M. Navarro, District Judge
United States District Court